# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10182

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2014

Lyle W. Cayce
Clerk

HOMETOWN 2006-1 1925 VALLEY VIEW, L.L.C., a Texas Limited Liability Company,

> Plaintiff - Appellee

v.

PRIME INCOME ASSET MANAGEMENT, L.L.C.,

> Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:11-CV-2633

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:*

Prime Income Asset Management, L.L.C. ("Prime") is the guarantor of a note held by Hometown 2006-1 1925 Valley View, L.L.C. ("Hometown") and secured by real property in Texas. After the borrower defaulted, the property was sold in foreclosure, and Hometown sought a deficiency judgment against Prime. Prime then sought an offset equal to the amount that the property's fair

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-10182

market value exceeded its sale price. The district court denied Prime's motion for a determination of the property's fair market value, finding that Prime waived its offset rights in its contract with Hometown. Prime appeals that decision, as well as the district court's award to Hometown of attorney's fees for work to protect the loan before Hometown sued Prime. We affirm both rulings by the district court.

## FACTS AND PROCEEDINGS

In October 2006, Transcontinental Brewery, Inc. ("Borrower") purchased real estate in Farmers Branch, Texas. The Borrower financed the acquisition of the property with a $2,450,000 loan from Hometown Commercial Capital, L.L.C. ("HCC") and executed a promissory note for $2,450,000 ("Note"), payable to HCC. Repayment of the Note was secured by a Deed of Trust and Security Agreement ("Deed of Trust"). In a guaranty agreement ("Guaranty"), Prime guaranteed to HCC and "its successors and assigns" the performance of obligations that the Borrower owed under the Note and Deed of Trust. In November 2006, HCC assigned the Note and Deed of Trust ("Loan Documents") to LaSalle Bank National Association ("LaSalle Bank"), as trustee under an indenture between Hometown Commercial Trust 2006-1 ("Trust") and LaSalle Bank. Bank of America, N.A. ("Bank of America"), the successor by merger to LaSalle Bank, later became the holder of the Loan Documents.

In June and July 2010, the Borrower failed to make timely payments on the loan. In July 2010, Midland Loan Services, Inc., a special servicer, sent a notice of default to the Borrower and offered the Borrower an opportunity to cure the default. When the Borrower did not cure, the law firm Thompson & Knight, acting on behalf of Bank of America, sent the Borrower a notice that the balance on the Note was payable in full, and that a foreclosure sale had

No. 14-10182

been scheduled for the Farmers Branch property. Around the same time, the Borrower demolished a building on the Farmers Branch property. In September 2010, the Borrower conveyed the Farmers Branch property to EQK Bridgeview Plaza, Inc. ("EQK"), an action that the district court characterized as an "event of default" under the Deed of Trust. EQK filed for bankruptcy in October 2010, triggering an automatic stay of any foreclosure sale. In March 2011, Bank of America obtained relief from the stay in bankruptcy court. In June 2011, Bank of America assigned the Loan Documents to Hometown, a limited liability company.

A non-judicial foreclosure sale of the Farmers Branch property was conducted in July 2011. At the foreclosure sale, Hometown was the only bidder and purchased the property for $1,370,000, which was applied to the loan balance. In October 2011, Hometown sued Prime for the post-foreclosure deficiency. Hometown moved for partial summary judgment. Prime moved for a determination of the fair market value of the Farmers Branch property under section 51.003 of the Texas Property Code. That section entitles a debtor to offset the deficiency amount by the difference between the sale price of the property and its fair market value.

The district court granted Hometown's motion for partial summary judgment, finding that Prime was liable to Hometown, as owner and holder of the Note and Guaranty, for the Borrower's payment and defaults. The district court denied Prime's motion for a determination of the fair market value of the property, finding that Prime had waived its right to an offset through the following language in the Guaranty:

> Section 1.4 <u>Guaranteed Obligations Not Reduced by Offset</u>. The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender

3

or against payment of any of the Debt or the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Loan (or the transactions creating the Loan) or otherwise.

The parties stipulated that Hometown suffered actual damages of $1,469,698.05, subject to Prime's reservation of its right to appeal the district court's ruling. The district court awarded Hometown $612,791.20 in attorney's fees, including $278,108.80 for work to protect the loan before the federal lawsuit and $334,682.40 for the federal lawsuit.

## DISCUSSION

The Guaranty between Prime and Hometown is a contract. *See McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013). "The interpretation of a contract—including whether the contract is ambiguous—is a question of law, which we review *de novo*. If a contract is ambiguous, the district court's findings of fact as to the intent of the parties are reviewed for clear error." *Id.* (citation omitted). In diversity cases, we interpret the contract by applying the substantive law of the forum state. *Id.* Following principles of contract interpretation articulated by the Texas Supreme Court, we must "ascertain the true intentions of the parties as expressed in the instrument." *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014) (internal quotation mark omitted). "When parties disagree over the meaning of an unambiguous contract, we determine the parties' intent by examining the entire agreement. Moreover, unless the agreement shows the parties used a term in a technical or different sense, the terms are given their plain, ordinary, and generally accepted meaning." *Id.* (footnotes omitted).

No. 14-10182

Both Hometown and Prime claim that the Guaranty is unambiguous, but they dispute its meaning. Prime argues on appeal that the Guaranty's language is not sufficiently specific to constitute a knowing and intentional waiver of offset rights under section 51.003 of the Texas Property Code. In addition, Prime challenges the district court's interpretation of the Guaranty as requiring Prime to pay for attorney's fees incurred before Hometown filed the federal lawsuit.

## I.    Offset Rights

Section 51.003 of the Texas Property Code is "designed to ensure that debtors receive credit when their foreclosed property is sold at an unreasonably low price." *Moayedi*, 438 S.W.3d at 6. When real property is sold in foreclosure for less than the unpaid balance of the indebtedness secured by the property, the lender may sue the guarantor to recover the deficiency. *See* Tex. Prop. Code Ann. § 51.003(a). However, section 51.003(c) entitles the guarantor to an offset against his liability equal to the amount that the property's fair market value exceeds its sale price. Tex. Prop. Code Ann. § 51.003(c); *Moayedi*, 438 S.W.3d at 5.

The Texas Supreme Court has held that guarantors may, by contract, waive their offset rights under section 51.003. *Moayedi*, 438 S.W.3d at 6. In *Moayedi*, the Texas Supreme Court held that the guarantor unambiguously waived his right to an offset through the following language in the guaranty agreement: "Guarantor further agrees that this Guaranty shall not be discharged, impaired or affected by . . . any defense (other than the full payment of the indebtedness hereby guaranteed in accordance with the terms hereof) that the Guarantor may or might have as to Guarantor's respective undertakings, liabilities and obligations hereunder, each and every such defense being hereby waived by the undersigned Guarantor." *Id*. at 3.

5

No. 14-10182

The court in *Moayedi* acknowledged that "[t]o be effective, a waiver must be clear and specific." *Id.* at 6. The court defined "waiver" as the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Id.* (internal quotation marks and citation omitted). The court nevertheless found that language waiving "any," "each," and "every" defense was sufficiently specific to effect a waiver of offset rights under section 51.003. *Id.* at 8. The court noted that "[j]ust because the waiver is all encompassing does not mean that it is unclear or vague." *Id.*

The language in Prime's Guaranty is even more specific than the language in the agreement at issue in *Moayedi*. The Guaranty provided, in relevant part, that "the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced . . . by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of any of the Debt or the Guaranteed Obligations." Guaranty § 1.4. If language in the *Moayedi* guaranty waiving "every . . . defense" was sufficiently specific to waive offset rights, so too was language in Prime's Guaranty waiving "any . . . offset, claim or defense." *See Moayedi*, 438 S.W.3d at 7 & n.31 (noting that language in a guaranty agreement that waived the "right of offset" was more specific than the language at issue in *Moayedi*).[1]

---

[1] Prime effectively argues that *Moayedi* was wrongly decided because the waiver at issue in that case was not sufficiently specific. However, under the *Erie* doctrine, we are bound to apply principles of contract interpretation articulated by the Texas Supreme Court and to make an informed judgment as to how a Texas court would rule if presented with the same facts. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002) ("Although there is no Texas Supreme Court case involving the exact contract language at issue here, Texas Supreme Court cases applying the applicable rules of contract construction to similar indemnity provisions provide ample guidance for this court to substitute an informed judgment for an informed guess as to how a Texas court would rule if presented with these facts." (internal quotation marks, alterations, and citation omitted)). Indeed, in an unsuccessful motion to stay the appeal pending the issuance of a decision in *Moayedi*, Prime acknowledged candidly

No. 14-10182

Nor do the identities of the parties provide a sufficient basis to distinguish this case from *Moayedi.* The *Moayedi* court noted that there was no "indication that Moayedi [the guarantor] was not a sophisticated businessman. After all, he was the president of Villages' [the borrower's] general partner." *Id.* at 8. Similarly, there is no indication that Prime, an asset management company, is not a sophisticated party.[2]

A finding of waiver here is also consistent with our own precedent. In *LaSalle Bank National Ass'n v. Sleutel,* 289 F.3d 837, 839–42 (5th Cir. 2002), we held that the guarantor waived his section 51.003 rights based on the following language in the guaranty agreement:

> To the extent allowed by applicable law, Guarantor expressly waives and relinquishes all rights and remedies now or hereafter accorded by applicable law to guarantors or sureties, including, without limitation: . . . any defense, right of offset or other claim which Guarantor may have against Borrower or which Borrower may have against Lender or the Holder of the Note.

If a waiver of "any . . . right of offset" in the *Sleutel* guaranty constitutes a waiver of section 51.003 rights, then so too does language in Prime's Guaranty that "obligations of Guarantor . . . shall not be reduced . . . by reason of any existing or future offset." *See also Haggard v. Bank of the Ozarks, Inc.*, 668 F.3d 196, 202 (5th Cir. 2012) (holding that the guarantor waived his offset rights through language providing that the guarantor's obligation "shall not be impaired or released, without written consent of the Bank, based on: 'any defenses, set-offs or counterclaims which may be available to Borrower or any other person or entity'").

---

that the Texas Supreme Court in *Moayedi* was "considering the very issue which would provide dispositive guidance relevant to this case to this Court, sitting as an *Erie* court."

[2] The record reflects that Prime had contracts to advise various companies that invested in real estate.

No. 14-10182

However, our analysis does not end with section 1.4 of the Guaranty; we must look to the entire contract to determine the parties' intent. *See Moayedi*, 438 S.W.3d. at 8. Prime points to the following language in the Guaranty: "Guarantor WAIVES each and every right to which it may be entitled by virtue of any suretyship law, including any rights it may have pursuant to . . . Section 51.005 of the Texas Property Code."[3] Guaranty § 5.13. Prime argues that the express waiver of section 51.005 rights, compared to the absence of an explicit reference to section 51.003, indicates that the parties did not intend for Prime to waive its offset rights under section 51.003. *See CKB & Assocs., Inc. v. Moore McCormack Petrol., Inc.*, 734 S.W.2d 653, 655 (Tex. 1987) (relying on the rule of contract construction "*expressio unius est exclusio alterius*, meaning that the naming of one thing excludes another"). However, the words "any" and "including" indicate that the list of waived rights in section 5.13 of the Guaranty is illustrative, and not exhaustive. *See Tex. Prop. & Cas. Ins. Guar. Ass'n/Sw. Aggregates, Inc. v. Sw. Aggregates, Inc.*, 982 S.W.2d 600, 608 (Tex. App. 1998) ("It is hornbook law that the use of the word *including* indicates that the specified list . . . is illustrative, not exclusive." (alteration in original) (internal quotation marks and citation omitted)); *cf.* Tex. Gov't Code Ann. § 311.005(13) (providing that in the context of statutory construction, "'[i]ncludes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded"). In addition, the *expressio unius* canon is only "an aid to the resolution of ambiguities," and does not trump the

---

[3] Section 51.005 of the Texas Property Code provides for offset rights if the foreclosure sale takes place *after* the debt holder obtains a judgment against the guarantor. *See* Tex. Prop. Code Ann. § 51.005(a). Because the foreclosure sale of the Farmers Branch property took place before Hometown obtained a judgment against Prime, section 51.005 does not apply to their dispute.

Guaranty's clear language precluding "any existing or future offset, claim or defense." Guaranty § 1.4. *See Smith v. Stonebridge Life Ins. Co.*, 217 F. App'x 360, 361 (5th Cir. 2007) ("Smith argues that we should apply the canon *expressio unius est exclusio alterius,* but that canon is only an aid to the resolution of ambiguities. Here there is no ambiguity." (citation omitted)); *Keystone Equity Mgmt. v. Thoen*, 730 S.W.2d 339, 340 (Tex. App. 1987) (declining to apply the *expressio unius* canon where the plain meaning of a contract supported the opposite interpretation).

Prime further argues that the Deed of Trust establishes that Prime did not waive offset rights in the Guaranty. The Deed of Trust provides a mechanism for determining the fair market value of the Farmers Branch property in the context of a deficiency action. Deed of Trust § 23.17. However, the mechanism provided by the Deed of Trust differs from and replaces the procedure that section 51.003 provides for calculating fair market value. Given that Prime moved in the district court for a determination of fair market value under section 51.003, Prime cannot now assert that it is bound by—and may benefit from—the procedure outlined in the Deed of Trust. In addition, while Prime, under the Guaranty, assumed the Borrower's *obligations* set forth in the Deed of Trust, *see* Guaranty §§ 1.1, 1.2, the Guaranty does not entitle Prime to assert the Borrower's defenses, including the defense of offset. Indeed, the Guaranty provides:

> Guarantor hereby . . . waives any common law, equitable, statutory or other rights . . . which Guarantor might otherwise have . . . in connection with any of the following: [*inter alia,*] [t]he invalidity, illegality or unenforceability of all or any part of the Loan or the Guaranteed Obligations . . . including without limitation the fact that . . . the Borrower has valid defenses, claims or offsets . . . which render the Loan or the Guaranteed Obligations wholly or partially uncollectible from Borrower . . . it being agreed that Guarantor

shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Loan . . . .

Guaranty § 2.4. The Guaranty therefore precludes Prime from enforcing the offset rights to which the Borrower is entitled under the Deed of Trust.

Section 2.12 of the Guaranty further corroborates Prime's intent to waive offset rights. That section provides: "it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation *shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations*." Guaranty § 2.12 (emphasis added). The Texas Court of Appeals, in an analysis cited approvingly by the Texas Supreme Court, found that Moayedi's promise to "'unconditionally' . . . guarantee[] payment of [the] debt" corroborated his intent to waive offset rights under section 51.003. *Interstate 35/Chisam Rd., L.P. v. Moayedi*, 377 S.W.3d 791, 800 (Tex. App. 2012), *aff'd*, 438 S.W.3d 1, 8 (Tex. 2014) ("We agree with Moayedi that the meaning of the waiver in paragraph 7 depends on the rest of the agreement, but we agree with the court of appeals that these provisions indicate an intent that the guaranty would not be subject to any defense other than full payment."). Prime's guarantee of "full . . . payment" therefore further corroborates Prime's clear waiver, in section 1.4 of the Guaranty, of its offset rights under section 51.003 of the Texas Property Code. It was therefore proper for the district court to deny Prime's motion for a determination of the fair market value of the property sold in foreclosure.

No. 14-10182

## II.    Attorney's Fees

Prime also challenges the district court's award to Hometown of $278,108.80 for attorney's fees incurred between July 2010 and July 5, 2011 (the "pre-foreclosure" period). During that time, the law firm Thompson & Knight, acting on a contingency fee basis for Bank of America, sent the Borrower a notice of foreclosure sale, posted the Farmers Branch property for foreclosure sale, and litigated in EQK's bankruptcy proceeding to obtain relief from an automatic stay of the foreclosure sale. The district court awarded these fees to Hometown based on time sheets submitted by Thompson & Knight. The court rejected Prime's argument that these fees are not recoverable under the language of the Guaranty.

Under Texas law, "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8). However, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's." *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009); *see also Spillman v. Self-Serv Fixture Co.*, 693 S.W.2d 656, 657 (Tex. App. 1985) (interpreting the language of a guaranty to decide the extent of the guarantor's obligation to pay attorney's fees to the creditor). We review the district court's interpretation of a contract *de novo. McLane Foodservice, Inc.*, 736 F.3d at 377.

The Guaranty provides: "In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder." Guaranty § 1.8. "Lender's rights hereunder," i.e., under the Guaranty, include

11

"the payment and performance of . . . the full amount of the Debt and all other obligations of Borrower to Lender under the Loan Documents," which include the Note and Deed of Trust. Guaranty §§ 1.1, 1.2; Deed of Trust § 2.6. Because the pre-foreclosure attorney's fees represent work to enforce the Note and Deed of Trust, these fees were incurred in "the preservation of Lender's rights" under the Guaranty. The district court therefore properly awarded Hometown attorney's fees for action to protect the loan before the foreclosure and ensuing federal court litigation.[4]

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order denying Prime's motion for a determination of fair market value and its award to Hometown of attorney's fees of $278,108.80 for the pre-foreclosure period.

---

[4] Prime argues only that the Guaranty does not cover fees incurred during the pre-foreclosure period; Prime does not argue on appeal that Hometown is not the proper party to collect these fees because these fees were incurred before the Loan Documents were assigned to Hometown. The district court considered and rejected that argument, concluding that Hometown was entitled to these fees because Hometown had a "right to enforce the Loan Documents" as their current owner and holder.